301 Ga. 348
FINAL COPY

S17A0139. SMITH v. THE STATE.

GRANT, Justice.

A Clayton County jury found appellant Dale El Smith guilty of felony murder and two counts of cruelty to a person age 65 or older in connection with the death of Arthur Pelham. On appeal, Smith argues that there was insufficient evidence to support her convictions and that she received ineffective assistance of counsel at trial. Neither contention has merit, and we affirm.[1]

---

[1] Smith's crimes were committed on January 6, 2014. On August 6, 2014, a Clayton County grand jury indicted Smith for one count of felony murder and two counts of cruelty to a person age 65 or older. After a trial held March 9-12, 2015, the jury found Smith guilty of all charges. The trial court sentenced Smith to serve life in prison with the possibility of parole for felony murder and a concurrent 20-year term on one of the two counts of cruelty to a person age 65 or older; the other count was merged into the felony murder conviction. On March 13, 2015, Smith filed a motion for new trial, which was amended on June 30, 2015. Following a hearing on October 6, 2015, the trial court denied her motion on November 9, 2015. Smith filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2016 and was submitted for decision on the briefs.

I.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that, starting in 2008, Smith was a paid care provider for Pelham, a disabled Vietnam veteran who earned benefits from the Department of Veteran Affairs ("VA"). As part of her services, Smith rented Pelham a room in her split-level home; she had a similar arrangement with several other residents. Smith lived in the upstairs portion of the house and Pelham and the other residents lived in the downstairs portion. The VA also contracted with an adult daycare facility to provide care and supervision for Pelham on weekdays and made arrangements with a transportation service to drive Pelham to and from the daycare. As part of the process of enrolling Pelham, Smith signed a contract acknowledging that the daycare center would be closed on days when Clayton County schools were closed due to inclement weather.

Residents of Smith's home were often found wandering around the neighborhood improperly dressed for the weather. Neighbor Oghenmne Okpadu testified that more than once she had seen Pelham knocking on Smith's door asking for food, and had even seen Pelham lying in the street in the middle

2

of the night. Another neighbor testified to seeing Pelham standing on the side of the road after dark miles away from home. Yet another saw Pelham wandering in the street with no water when the temperature was approximately 95 degrees.

Unfortunately for Mr. Pelham, the story did not end with the neighbors; his treatment was so poor that numerous law enforcement officers received and responded to 911 calls involving Pelham. A Clayton County Sherriff's officer responded to a 911 call and found Pelham walking along a highway, disoriented and unsteady from being out in the blistering heat. A Clayton County police officer arrived at Smith's house after a 911 call from Pelham and observed that the house had dog and human feces on the floor, spoiled food in the refrigerator, and no heat in the downstairs portion where residents lived. Because Pelham often spent extended periods of time unsupervised at the local Waffle House, concerned employees placed multiple 911 calls regarding Pelham. The bus driver who provided transportation to and from the daycare testified that Pelham was the only client who waited alone outside his residence, and that he did so in all types of weather.

On January 6, 2014, both Clayton County schools and the daycare that Pelham attended were closed due to a weather emergency — temperatures were freezing. That same morning, Okpadu, one of the neighbors who had helped Pelham in the past, saw Pelham sitting outside on the steps of Smith's house — alone — at about 7:00 a.m. Another neighbor saw Pelham waiting outside by Smith's mailbox around 8:00 a.m. When Okpadu's mother drove by Smith's house at about 8:30 a.m., Pelham flagged her down. Pelham was dressed in khakis, a t-shirt, and a light jacket, and was shaking from the cold. He told Okpadu's mother that he was waiting on the bus to take him to daycare. When she told Pelham that he should go inside, Pelham responded, "she won't let me in." After noticing Smith's car parked in the driveway, Okpadu's mother instructed Pelham to knock and ring the bell, which he said he had already done. Okpadu's mother instructed him to keep knocking and drove away at about 9:15 a.m. Pelham was still in the driveway when she left.

At about 10:00 a.m., Okpadu again saw Pelham standing outside Smith's home near the mailbox. Later that day, Okpadu's son went outside to check on the family's dog and discovered Pelham, face down, outside Smith's back door. The son called for help, and Okpadu found a jacket to try to warm Pelham while

4

her son went to find further assistance. Although Smith came outside — and saw Pelham's body — she went back into the house without rendering any aid to Pelham or asking anyone to call for help.

Emergency personnel and law enforcement, responding to a 911 call, arrived at Smith's house at about 5:22 p.m., but aggressive dogs in Smith's back yard hindered them from reaching Pelham. During this time, Smith walked over to Pelham's body, looked at it, and walked back inside, ignoring repeated requests to secure the dogs. A neighbor finally secured the dogs and emergency medical personnel were able to reach Pelham. After some delay, Smith came to her door but refused to give law enforcement officers any information about Pelham's medical history. Once inside, officers determined that the only source of heat for the downstairs residents was a small oven that was turned on and left ajar. The portion of the house where Smith lived, on the other hand, was apparently heated.

Smith had been home all day watching TV. She denied knowing that the daycare was closed, and also disputed that Pelham had knocked on the door or rang the doorbell that day. Smith insisted that she did not know that Pelham was outside all day. But she did admit that she had never given Pelham, or any

of the other residents, a key to the house. Meanwhile, EMS took Pelham, who was unconscious and covered in urine, to Regional Medical Center where he was treated for hypothermia. Attempts to revive Pelham were unsuccessful, and he died at the hospital. The cause of death was hypothermia due to exposure to freezing temperatures. Pelham was over the age of 65.

## II.

Smith contends that there was insufficient evidence to support her convictions for felony murder and cruelty to an elderly person because she did not know or have reason to know that Pelham was not at his daycare facility. She insists that there is no evidence that Pelham knocked or rang the doorbell, or that she refused to allow him back into the house. But contrary to Smith's contentions, there is more than sufficient evidence to show that she acted with the requisite intent.

To begin, all that is required to support a felony murder conviction is evidence of the intent to commit the underlying felony. *Holliman v. State*, 257 Ga. 209, 210 (1) (356 SE2d 886) (1987) ("The primary difference between the offenses of malice murder and felony murder is that felony murder does not require malice or the intent to kill. . . . Felony murder does, however, require

6

that the defendant possess the requisite criminal intent to commit the underlying felony.") (citation omitted); OCGA § 16-5-1 (c) ("A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice."). In this case, the underlying felony is cruelty to a person 65 years or older. That crime is committed when

> [a] guardian or other person supervising the welfare of or having immediate charge, control, or custody of a disabled adult, elder person, or resident commits the offense of neglect to a disabled adult, elder person, or resident when the person willfully deprives a disabled adult, elder person, or resident of health care, shelter, or necessary sustenance to the extent that the health or well-being of such person is jeopardized.

OCGA § 16-5-101 (a).

Here, the evidence at trial showed that Smith was the primary caregiver for Pelham; that the temperatures were freezing outside; that she refused to allow Pelham back into the house; that she therefore deprived him of shelter and sustenance throughout the day; and that he died as a result of the deprivation of shelter. The jury was entitled to reject Smith's claims that she did not know that Pelham's daycare center would be closed when Clayton County schools were closed for inclement weather, because she signed the daycare form acknowledging this policy. Furthermore, Smith knew that Pelham could not get

7

back inside the house after she locked the door because she never gave him, or any other resident, a key. This evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Smith willfully deprived Pelham of shelter and necessary sustenance and that his death was the result of Smith's felonious action. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

## III.

Smith's next contention is that her trial counsel rendered ineffective assistance, both by failing to investigate and by failing to submit jury instructions on involuntary manslaughter or reckless conduct. We disagree on both fronts.

> To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficiency so prejudiced defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different.

8

*Domingues v. State*, 277 Ga. 373, 374 (2) (589 SE2d 102) (2003) (citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). "The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct." Id. And in order to show prejudice with regard to his counsel's alleged failure to fully investigate the case and call essential witnesses, a criminal defendant must proffer information on what a thorough investigation would have uncovered or what the essential witnesses would have said. Id.; *Grant v. State*, 295 Ga. 126, 132 (5) (c) (757 SE2d 831) (2014) (Even assuming that trial counsel's performance was deficient, "[a]ppellant presented no evidence of what further investigation by counsel would have revealed and failed to identify any witness not interviewed by defense counsel whose testimony would have been favorable to appellant. Absent a proffer of what evidence would have been discovered had other witnesses been interviewed, appellant cannot show that the failure to interview them affected the outcome of trial."). "If an appellant fails to meet either prong of the *Strickland* test, it is not incumbent upon this Court to examine the other prong." *Green v. State*, 291

9

Ga. 579, 580 (2) (731 SE2d 359) (2012). We consider Smith's ineffective assistance of counsel arguments in turn.

(a) Smith contends that her trial counsel was ineffective for failing to investigate or interview witnesses on the State's witness list or witnesses identified by Smith. She further asserts that trial counsel failed to re-examine any physical evidence. But she does not mention any particular witness that trial counsel failed to interview, or any specific piece of evidence that trial counsel failed to investigate. For the prejudice prong of the inquiry, Smith simply submits that she obviously suffered prejudice because she was convicted of felony murder.

Smith's trial counsel testified that he interviewed several witnesses in preparation for trial. In addition, trial counsel testified that he called two witnesses who were willing to provide beneficial testimony on Smith's behalf. In contrast, Smith has failed to proffer the content of any witness testimony in support of her motion for new trial. Her claim of ineffective assistance of trial counsel cannot succeed because she has failed to show that her trial counsel's investigation was deficient in any way.

10

(b) Smith next argues that her trial counsel rendered ineffective assistance by failing to submit jury instructions on OCGA § 16-5-3 (involuntary manslaughter) or § 16-5-60 (b) (reckless conduct). Smith maintains the jury should have had the opportunity to consider these lesser included offenses. Again, Smith summarily contends that she suffered prejudice because she was convicted of felony murder. And again, her arguments are not sufficient.

"Decisions about which jury charges to request are classic matters of trial strategy." *Jessie v. State*, 294 Ga. 375, 377 (2) (a) (754 SE2d 46) (2014). Trial counsel testified that his theory of the case was that Pelham's death was the result of an accident because, in his view, there was no conclusive evidence that Smith knew that the daycare van did not pick up Pelham or that the daycare was closed due to inclement weather. He testified that Smith denied intentionally locking Pelham out of the house. Trial counsel maintained that his "whole focus" was on a not guilty strategy and thus that he sought to avoid admitting even to any negligent, much less reckless, intent. Pursuit of an "all or nothing" defense is a permissible trial strategy. Id.; see also *McKee v. State*, 277 Ga. 577, 579-580 (6) (a), (b) (591 SE2d 814) (2004) (rejecting an ineffective assistance of counsel claim where trial counsel failed to request jury instructions on lesser

included offenses, including involuntary manslaughter, and instead pursued an "all or nothing" defense strategy to the charge of felony murder).  We cannot say that trial counsel's decision to pursue an "all or nothing" defense, which was based on his client's account of the events, fell below a reasonable standard of attorney conduct. Accordingly, Smith failed to establish deficient performance.

Judgment affirmed.  All the Justices concur.

Decided June 5, 2017.

Murder. Clayton Superior Court. Before Judge Carter.

Darrell B. Reynolds, Sr., for appellant.

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Kathryn L. Powers, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellee.