314 Ga. 153
FINAL COPY

S22A0242.  TALLEY v. THE STATE.

BETHEL, Justice.

A Fulton County jury found Mario Talley guilty of the malice murder of Rodney Walker, the aggravated assault and attempted armed robbery of Isiah Knight, and other offenses. Talley appeals from the denial of his motion for new trial, arguing that the trial court erred by admitting certain evidence at trial and that his trial counsel provided constitutionally ineffective assistance. We affirm.[1]

---

[1] The crimes occurred on March 9, 2014. On June 13, 2014, a Fulton County grand jury indicted Talley for the malice murder of Walker (Count 1), felony murder of Walker predicated on criminal attempt to commit armed robbery (Count 2), felony murder of Walker predicated on aggravated assault (Count 3), felony murder of Walker predicated on first-degree burglary (Count 4), felony murder of Walker predicated on possession of a firearm by a convicted felon (Count 5), criminal attempt to commit armed robbery of Knight (Count 6), aggravated assault of Walker (Count 7), aggravated assault of Knight (Count 8), aggravated battery of Knight (Count 9), burglary in the first degree of Knight's dwelling (Count 10), possession of a firearm during the commission of a felony (Count 11), possession of a firearm by a convicted felon under OCGA § 16-11-131 (Count 12), and possession of a firearm by a convicted felon under OCGA § 16-11-133 (Count 13).

At a jury trial held from June 8 to 12, 2015, the trial court granted

1. The evidence presented at trial showed the following.[2] Around 11:00 p.m. on March 9, 2014, Knight was at his apartment on the west side of Atlanta, where he was known to sell drugs. He testified that he answered the door and saw Talley and Walker

Talley's motion for directed verdict of acquittal on Count 9. The jury found Talley guilty of the remaining counts. On June 15, 2015, the trial court sentenced Talley to serve life in prison on Count 1; 20 years in prison on Count 8, to be served consecutively to Count 1; five years in prison on Count 11, to be served consecutively to Count 8; and 15 years in prison on Count 13, to be served consecutively to Count 11. The trial court purported to merge the remaining counts for sentencing.

Through new counsel, Talley filed a motion for new trial, which he amended on November 16, 2016. The trial court held a hearing on the motion on January 19, 2017, and denied the motion on March 13, 2020. In its order, however, the trial court noted that it had made a number of errors in sentencing; vacated the previously entered sentences on Counts 6, 10, and 12; and scheduled a hearing for resentencing for May 21, 2020.

Talley and the State later filed a joint motion for resentencing and requested that Talley be resentenced without a hearing. The trial court granted the motion and entered a new sentencing order on September 22, 2021, which sentenced Talley to life in prison on Count 1; 30 years in prison on Count 6, to be served concurrently with Count 1; 20 years in prison on Count 8, to be served consecutively to Count 1; 20 years in prison on Count 10, to be served concurrently with Count 8; and 15 years in prison on Count 13, to be served consecutively to Count 8. Counts 2 through 5 were vacated by operation of law, and the remaining counts were merged for sentencing.

Talley filed a notice of appeal on September 27, 2021. His case was docketed to the term of this Court commencing in December 2021, and oral argument was held on February 15, 2022.

[2] Because this case requires an assessment of whether certain assumed errors by the trial court were harmless and whether trial counsel's performance resulted in prejudice to Talley, we lay out the evidence in detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 (1) n.2 (845 SE2d 653) (2020).

standing outside. Talley told Knight that Tavarus Simon was also outside. When he saw Talley and Walker and heard that Simon was outside, Knight picked up his .22-caliber rifle. He testified that he did this because he was outnumbered three-to-one.

Knight let Talley and Walker inside. He never saw Simon or let him into the apartment. Once inside, Talley and Walker asked Knight if they could see his rifle. Knight refused, and Talley then asked him for a pistol. As Knight reached down, Talley pulled out a handgun, pointed it at Knight, and said, "You know what time it is." Knight then raised his rifle and attempted to fire it. However, the gun jammed, and he was unable to fire. Talley then shot Knight twice.

After being shot, Knight ran toward a back room of the apartment. Talley ran out of the apartment, and Walker followed him. Knight then heard gunshots outside the apartment. A few minutes later, his neighbor knocked on the door. He let her inside, told her he had been shot, and asked her to call the police. Knight then went out into the hallway. He saw a truck pull up to the

building, and he asked his neighbor to pull him inside her apartment because he was worried that others might be coming to "finish the job."[3]

Knight later identified Talley, Walker, and Simon in photographic lineups, specifically identifying Talley as the person who shot him. Knight also identified Talley as the shooter during his trial testimony. Knight testified that he never saw Walker with a gun the night of the shooting and that the only person he saw fire a gun was Talley.

Shanitha Armour testified that, on the night of the shooting, she was sitting on the steps at the front of Knight's apartment building. She testified that Simon, Walker, and "Anlo," who was later identified by Talley as D'Angelo Williams, walked by her and

---

[3] Knight testified that he initially told the police that the shooting occurred in the stairway outside his apartment because he kept marijuana in his apartment and was worried he would get in trouble. When he was later confronted by a detective about this, Knight admitted that he had lied. The detective testified that, other than lying about where the shooting took place, Knight never changed his story about the shooting, including that Talley was the person who shot him.

4

that Walker told her that "the best thing for you to do is leave." According to Armour, Walker was carrying a pistol at the time. She said that Walker, Simon, and two other men then went upstairs to Knight's apartment and that Williams stayed with her.[4] Armour then heard shots fired upstairs, and she ran to the side of the building. She then saw Walker run out of the building "bleeding real bad." Simon tried to help Walker move away from the building, but Walker collapsed and fell to the ground. The two other men who had gone upstairs ran to a green truck that was parked nearby. Armour identified Walker and Simon in photographic lineups, but she was unable to identify anyone she recognized in a photographic lineup that included Talley's picture.

Karetta Harris, Knight's neighbor from across the hall, also heard the confrontation and the gunshots and then saw at least four

---

[4] On cross-examination, Armour testified that she had never seen Talley before. She also testified that all of the shots were fired inside the apartment and that she did not hear any shooting on the stairs. She later clarified that once the shooting started she did not "stick around" to see what was going on in the breezeway or the stairwell.

men out in the hallway through her peephole. She observed one man "wildly" shooting a gun as he ran away from Knight's apartment.[5] Harris testified that, after the shooting and commotion ended, Knight fell into the doorway of her apartment. She helped him back to his apartment, applied pressure to his wounds, and called 911.

Walker's girlfriend, Saleema Glaze, lived in a nearby apartment complex. After the shooting, Simon left Knight's complex and went to Glaze's apartment. He told her that Walker had been killed. Glaze ran up the hill to Knight's apartment complex. She testified that, as she arrived, she saw three young men run out of the complex with guns in their hands. Two of the men were carrying duffel bags. Glaze could only identify one of the men she saw, a man she knew as "Hollywood." She saw the men get into a car and drive away. Glaze did not see Talley at any point that evening.

Glaze walked the rest of the way into the complex and saw that

---

[5] Harris testified that she could not see the shooter's face because his back was to her and he was running and jumping. Roy Toomer, who shared the apartment with Harris, was in his bedroom when he heard the shooting. Toomer testified that he looked out his bedroom window and saw a man running down the steps and through a path that led to other apartments.

the police had arrived. She told the police that she had heard that Walker had been killed and that she could not find him. Walker's body was later found near one of the other buildings in the complex.

Glaze also testified that Walker told her that he and Talley had an "argument or altercation" about a week before the incident at the apartment complex. The argument was about some type of "criminal enterprise." Glaze testified that Talley told Walker that he "wasn't going to fight him; he was just going to kill him." On cross-examination, Glaze testified that Walker considered Talley to be "one of his best friends" and that Talley had helped Walker start a music career. She also testified that although Walker and Talley had an altercation, they had "gotten cool afterwards" and "made up."

The medical examiner later determined that Walker was hit by multiple gunshots that were consistent with having been fired by someone standing below him on a set of stairs from less than two feet away. Walker showed signs of other injuries that were consistent with falling down stairs and onto a hard surface. The medical examiner determined that Walker died as the result of a

gunshot wound to his neck and that the manner of his death was homicide.

Knight had two cousins, Wilbur McDew and Antonio Edwards, the latter of whom was known as "Hollywood." Around 11:00 on the night of the shooting, McDew and Edwards were with Knight's brother, Willie Lyons, at a recording studio in east Atlanta. Knight called Edwards and told him that Walker and Talley had tried to rob him and that he had been shot. Lyons, McDew, and Edwards left the studio and drove to Knight's apartment complex in Lyons's black SUV.[6] When they arrived, Lyons went upstairs to Knight's apartment, but the door was locked. The police were interviewing Harris at the time, and an officer told Lyons that Knight had been taken to a hospital. Lyons was not permitted to go into Knight's apartment, and he, McDew, and Edwards got back into the SUV and drove away from the complex.

They returned later in the evening, and a police officer allowed

_____

[6] Knight testified that the truck he saw in the parking lot after the shooting was "black" or "navy blue" and that it was not the black SUV that belonged to Lyons.

Lyons and McDew to enter Knight's apartment while Edwards stayed in the car. Lyons found a rifle that belonged to him next to the door of the apartment. The rifle had blood on it, and Lyons placed it into a purple duffel bag and carried it out of the apartment. They also removed some marijuana that was in a trash bag. Lyons and McDew testified that they did not remove any shell casings, bullets, or other guns from the apartment.

As Lyons and McDew exited the apartment, someone in the parking lot began yelling that the two of them had shot Walker. Lyons and McDew were stopped by the police and separated, and the bags they were carrying were confiscated. By that point, Edwards had driven away. Lyons and McDew testified that neither they nor Edwards were carrying guns when they came to Knight's apartment and had not "run around with guns" at any point that evening.[7]

---

[7] The State also introduced cell phone data showing that Edwards's phone was on the east side of Atlanta between 11:06 and 11:12 on the night of the shooting and was not connecting to any cell towers near Knight's apartment complex at that time. An expert in cell phone technology testified

The police later obtained a search warrant for Knight's apartment.[8] Inside, they located three bullets and four shell casings that had been fired from a .40-caliber handgun. An additional .40-caliber shell casing was found on the ground outside the apartment building. A firearms examiner testified that all of the bullets and shell casings had been fired from a .40-caliber Smith & Wesson pistol and that the shell casings had all been fired from the same pistol. The pistol was never recovered by the police.

---

that it would be "impossible" for that phone to be hitting off towers on the east side of Atlanta while at Knight's apartment. The expert testified that, shortly thereafter, the phone began moving west and arrived at the area around Knight's apartment around 11:37 p.m.

[8] According to one of the officers who responded to the scene, the police had already "processed" and "released" the apartment by the time Lyons and McDew were allowed to go inside. The officer explained that, by that time, the crime scene investigators had taken pictures and "collected what they needed to collect," so there was no reason not to allow Lyons and McDew inside. The lead detective on the case later testified, however, that no one from the Atlanta Police Department actually went inside Knight's apartment on the night of the shooting because the initial investigation focused on the building's stairwell and parking lot and the path behind the building where Walker's body was found. It was only after interviews with several witnesses in the hours following the shooting that the police obtained a search warrant and went inside the apartment the next morning. The detective testified that, up to that point, Lyons and McDew were the only people who had been inside the apartment and that the items that were seized from them were the only items that had been taken from the apartment.

Talley was arrested on March 16 and, after being given *Miranda* warnings,[9] was interviewed by two detectives. An audio and video recording of the interview was played for the jury. Talley said that, although he had heard that Walker had been shot and killed, he was not at Knight's apartment at the time of the shootings but that he had been to the complex before. He stated that he had been at his mother's house when the shootings occurred. He later elaborated that he drove his girlfriend to the Atlanta airport in a rental car around 5:00 that evening. Walker, Simon, and Williams followed him to the airport and picked him up after he dropped off the rental car. The group came to Talley's mother's house around 7:00 p.m. to pick up some music recording equipment. Some of the men left with the equipment but returned it to Talley at his mother's house around 9:00 p.m. Talley stayed at his mother's house the rest of the night and played cards with his cousin, his mom, and her boyfriend until 3:00 a.m.

---

[9] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

On April 4, Talley called his mother from jail.[10] In that call, a recording of which was played for the jury, Talley told his mother that his story was "not going to work." His mother then told him that Williams and one of the others had already spoken to the police and that Talley should not have done so. She then told him that he should say that he omitted details about his whereabouts the night of the shootings when he was interviewed by the police because he was scared.

The police obtained records for Talley's cell phone which showed that his phone placed or received 13 phone calls that connected through a cell phone tower in the vicinity of Knight's apartment in the hours leading up to 10:46 the night of the shootings. The State's expert testified that if a person holding that phone was near the Atlanta airport, a signal from that phone would

---

[10] One of the detectives who interviewed Talley identified Talley and his mother as the speakers on the call. The detective had also interviewed Talley's mother on a prior occasion. The detective testified that Talley used another inmate's personal identification number assigned by the jail to place the April 4 call and that it was common for inmates to "swap[ ] PIN numbers" after making some initial calls from the jail to family members. Talley did not object to the admission of the recording of the call or the detective's testimony identifying Talley and his mother as the speakers.

not be pinging off a cell tower near Knight's apartment. The expert also testified that, after Talley's phone placed a call at 10:46 the night of the shootings, it was either turned off or placed in "airplane mode" for approximately 18 hours.

The State introduced certified copies of Talley's prior felony convictions for robbery, aggravated assault, and possession of a firearm during the commission of a felony.

Talley testified at trial. On direct examination, he admitted that he had previously been convicted of aggravated assault and robbery but stated that he did not shoot Knight or try to rob him and that he did not shoot and kill Walker.[11] On cross-examination, Talley also admitted being convicted of possession of a firearm during the commission of a felony and being sentenced to 12 years in prison.

As to his whereabouts on March 9, Talley testified as follows. He and his girlfriend left a hotel where they had been staying and

---

[11] The trial court cautioned Talley's counsel about pursuing this line of questioning with Talley. However, counsel told the court in a bench conference that explaining Talley's prior convictions was "something [Talley] is demanding or he would fire me. He wants to explain his past."

went to Talley's mother's house. Around 5:00 p.m. he drove her to the airport and then dropped off a rental car. Walker, Simon, and Williams followed him, and they picked Talley up and drove back to his mother's house. They then took some music recording equipment to another apartment in the same complex as Knight's apartment. Talley never went to Knight's building, and Williams took Talley back to his mother's house later in the evening. Talley then stayed at his mother's house and played cards with his mother, stepfather, and cousin.

On cross-examination, Talley stated that he was honest with the detectives when he was interviewed but that he did not tell them about going to Knight's apartment complex the night of the shootings because he did not want to get in trouble for something he did not do. He also denied that he called his mother from jail. He stated that he was at his mother's house at 9:00 p.m. on March 9 and that he did not understand why cell records showed that his phone was near Knight's apartment at that time. Talley later testified that someone called him around 11:00 that night to tell him

Walker was dead, but when confronted with evidence that his phone was powered off at 10:46 p.m. and not turned back on for 18 hours, he said that he turned the phone off because it had been damaged. He also admitted that he had no paperwork showing that his girlfriend had a plane ticket that night or that he had rented a car.

2. Talley first argues that the trial court abused its discretion by admitting statements that Walker made to Glaze about a prior incident between Walker and Talley and a threat made against Walker by Talley. Talley asserts that the statements were inadmissible under OCGA § 24-4-403 ("Rule 403"), OCGA § 24-4-404 (b) ("Rule 404 (b)"), and OCGA § 24-8-807 ("Rule 807").

The State moved in limine to admit these statements pursuant to the residual exception to the hearsay rule in Rule 807, and Talley objected to the admission of the statements on that basis. Talley did not object to the admission of this evidence under Rule 403 or as improper other-acts evidence under Rule 404 (b). Prior to Glaze's testimony and in response to the State's motion in limine, the trial court ruled outside the jury's presence that Glaze could testify about

15

what Walker told her "under the residual hearsay exception." The trial court also instructed Glaze not to mention any specific criminal acts that Walker and Talley might have been involved in and to instead limit her testimony to "a general criminal enterprise."

As recounted above, Glaze testified at trial that Walker told her that he and Talley had an "argument or altercation" about a week before the incident in which Walker was killed. The argument was about a "criminal enterprise." Glaze testified that Talley told Walker that he "wasn't going to fight him; he was just going to kill him." On cross-examination, Glaze testified that Walker considered Talley to be "one of his best friends" and that Talley had helped Walker start a music career. She also testified that although Walker and Talley had an altercation, they had "gotten cool afterwards" and "made up."

Pretermitting any error in the admission of the disputed statements on any of the grounds asserted by Talley, any such error was harmless. The test for determining whether a non-constitutional evidentiary error was harmless is whether it is highly

16

probable that the error did not contribute to the verdict. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019).[12] In conducting this harmless-error review, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.) Id.

Here, the evidence of prior conflict between Walker and Talley was limited to Glaze's testimony and provided no detail of what had occurred between them. Glaze later clarified on cross-examination that Walker and Talley had "made up" and were "cool" by the time of the incident in which Walker was killed. In addition, her testimony about the "criminal enterprise" was vague, per the

---

[12] Because Talley did not object to this evidence at trial under Rule 403 or Rule 404 (b), our review of his claim of error on those bases is for plain error only. See *Gates v. State*, 298 Ga. 324, 326-327 (3) (781 SE2d 772) (2016); OCGA § 24-1-103 (d). In order to conclude that the trial court committed plain error by not excluding the evidence under Rule 403 or Rule 404 (b), we must determine that, among other factors, "the error . . . affected [Talley's] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings." (Citation and punctuation omitted.) Id. at 327 (3). However, we need not analyze that question in detail because where a claim of error fails under the harmless-error standard of review that is more favorable to the appellant, it also fails under the more stringent plain-error standard. See *Smith v. State*, 313 Ga. 584, 587-588 (872 SE2d 262) (2022).

instructions of the trial court.

This evidence also had little bearing on the issues in the case. At trial, the State never contended that Talley intended to shoot Walker. Instead, the State's theory was that Talley fired his gun at Knight's apartment as Talley and Walker fled and that Talley shot Walker by accident. In turn, Talley's defense was that he was not the shooter and was not at the apartment during the incident.

Moreover, as to the identity of the shooter, the evidence against Talley was strong. Knight, who knew Talley, consistently identified Talley as the shooter, and cell phone evidence contradicted Talley's statements to the police that he had been at the Atlanta airport around the time of the shooting. The physical evidence at the crime scene was also consistent with Knight's version of events. Finally, Talley may have damaged his credibility with the jury when he denied speaking to his mother from jail about changing his alibi story despite the call being recorded and testimony by a detective identifying both Talley and his mother as the speakers on the call. Given this evidence, it is highly probable that any error in admitting

18

the evidence of Walker's statements to Glaze did not contribute to the verdicts. See *Jackson*, 306 Ga. at 81 (2) (c) (concluding that the erroneous admission of evidence of a prior shooting did not contribute to the jury's verdict "given the overall strength of the other evidence" of guilt); see also *Keller v. State*, 308 Ga. 492, 503 (5) (842 SE2d 22) (2020) (determining that evidentiary error was harmless "in light of the strong evidence of [appellant's] guilt"). Thus, this enumeration of error fails.

3. Talley next contends that his trial counsel provided ineffective assistance in several regards. To prevail on these claims, Talley

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Talley] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Talley] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

19

(Citation and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016).

(a) Talley first asserts that his trial counsel performed deficiently by failing to object to Glaze's testimony repeating Walker's statements about the threat Talley made against him and the "criminal enterprise" under Rule 403 and Rule 404 (b). As noted above, trial counsel only objected to the admission of this evidence under Rule 807, which was the basis on which the State sought to admit the statements at trial.

However, pretermitting whether trial counsel performed deficiently by not objecting under Rule 403 and Rule 404 (b), and consistent with our determination that any trial court error in admitting this evidence under Rule 807 was harmless, we cannot say that the failure to object to this evidence on the grounds asserted

by Talley created a reasonable probability that, but for the failure to make these objections, the outcome of the trial could have been different. See *Stafford v. State*, 312 Ga. 811, 824 (5) (b) (865 SE2d 116) (2021) (no prejudice where counsel's failure to make an objection to certain evidence under the Confrontation Clause was harmless for the same reason that it was harmless for the trial court to admit the same evidence under the co-conspirator exception to the hearsay rule). Moreover, although the evidence of the "criminal enterprise" and Talley's threat against Walker might have reflected negatively on Talley, "even if objectionable, [it was] not particularly disparaging of [Talley's] character when viewed in context, especially given the strength of the other admissible evidence against him." *Naples v. State*, 308 Ga. 43, 54 (3) (a) (838 SE2d 780) (2020); see also *Lupoe v. State*, 300 Ga. 233, 244 (5) (794 SE2d 67) (2016) (defendant failed to show *Strickland* prejudice, even assuming his lawyer performed deficiently in failing to object to certain testimony about actions reflecting negatively on defendant). This claim of ineffective assistance therefore fails.

(b) Talley next asserts that his trial counsel performed deficiently by failing to object to certain statements testified to by police officers who spoke with Knight after the shooting. Specifically, Talley asserts that his counsel should have objected when one officer testified that he "was advised that [Talley] was on the scene when the incident occurred when Mr. Knight was shot." Over Talley's objection on hearsay grounds, the lead detective later testified that Knight had told her and other officers that Talley was the shooter. Talley argues that these statements were inadmissible hearsay and impermissibly bolstered Knight's testimony.

Even assuming the testimony of the first officer was objectionable on those grounds, however, we cannot say that trial counsel performed deficiently by failing to object to it. The testimony of the first officer regarding Knight's identification of Talley as the shooter was largely cumulative of Knight's own testimony and his consistent identifications of Talley as the shooter in a photographic lineup and at trial. In light of those identifications, even though trial counsel testified that it was not a strategic decision to withhold

22

objection, it was not objectively unreasonable for trial counsel in that position to forgo objections to the first officer's testimony so as not to further highlight Knight's identification of Talley for the jury. See *Harris v. State*, 310 Ga. 372, 386 (4) (b) (850 SE2d 77) (2020) (determining there was no deficient performance for failing to object to officers' testimony as hearsay and bolstering where appellant had failed to show that trial counsel's failure to object was unreasonable); see also *Tyson v. State*, 312 Ga. 585, 599-600 (6) (d) (864 SE2d 44) (2021) (determining that counsel's decision not to object so as not to highlight damaging testimony for the jury was not patently unreasonable and therefore not deficient performance).

With regard to the lead detective's testimony about Knight's identification, trial counsel did object on hearsay grounds, and Talley now asserts that counsel should have also objected on the ground that the detective's testimony impermissibly bolstered Knight's statements and testimony. However, any such objection would have been meritless. Talley has pointed to nothing in the detective's testimony in which the detective expressed an opinion as

23

to whether Knight had told the truth in identifying Talley as the shooter, see *Pender v. State*, 311 Ga. 98, 113 (3) (856 SE2d 302) (2021), and "[w]hen a witness's statement does not directly address the credibility of another witness, . . . there is no improper bolstering." *Brown v. State*, 302 Ga. 454, 460-461 (2) (b) (807 SE2d 369) (2017). Because the failure to make a meritless objection cannot form the basis of a claim of ineffective assistance, this claim fails. See *Moss v. State*, 298 Ga. 613, 617 (5) (a) (783 SE2d 652) (2016) ("The failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." (citation and punctuation omitted)).

(c) Talley also asserts that his trial counsel performed deficiently by failing to request a jury instruction on self-defense. Talley asserts that there was slight evidence that Knight picked up his rifle in the apartment before Talley demanded money from Knight and that a jury instruction on self-defense was therefore authorized and should have been requested. However, Talley has not shown his counsel performed deficiently by failing to request this

24

instruction.

As noted above, Talley's story to the police and his defense at trial was that he was not the shooter and was not at Knight's apartment when the incident occurred. Trial counsel testified that she "didn't think self-defense would be applicable in this case. But in hindsight, any lawyer would look at that and say: I should have." On cross-examination, trial counsel admitted, however, that pursuing a self-defense charge was "probably" inconsistent with the defense strategy.

Even assuming (dubiously) that there was slight evidence to support a self-defense charge, it was not unreasonable for trial counsel to forgo a request for that instruction and to instead focus entirely on arguing that Talley was not involved in the incident at all. See *Floyd v. State*, 307 Ga. 789, 802 (4) (b) (837 SE2d 790) (2020) (no deficient performance for failure to request jury instruction on self-defense that was contrary to the defense strategy); *Smith v. State*, 301 Ga. 348, 353-354 (III) (b) (801 SE2d 18) (2017) (no deficient performance where, based on defendant's account of

25

events, counsel decided to forgo jury instructions based on alternative defense theory); see also *Velasco v. State*, 306 Ga. 888, 893 (3) (b) (834 SE2d 21) (2019) ("Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy."); *Keener v. State*, 301 Ga. 848, 850 (2) (804 SE2d 383) (2017) ("[H]indsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim." (citation and punctuation omitted)). This claim of ineffective assistance fails.

(d) Talley also asserts that his trial counsel performed deficiently by failing to "request a severance of the firearm charge," which he argues would have prevented the introduction of evidence of a previous felony conviction at trial. Here, Talley was charged with two counts of possession of a firearm by a convicted felon; one under OCGA § 16-11-131 (Count 12) and a second under OCGA § 16-11-133 (Count 13). Count 12 was predicated on Talley's August

2009 felony conviction for robbery, and Count 13 was predicated on his August 2009 felony conviction for possession of a firearm during the commission of a robbery and aggravated assault.

Although Talley has not specified which of the firearms charges should have been severed, we conclude that trial counsel did not perform deficiently by failing to seek bifurcation of either charge. As to Count 12, that charge served as the predicate offense for one of the felony murder counts (Count 5). Thus, even if there had been a request for severance as to Count 12, the trial court would not have been required to bifurcate the trial on that basis. See *Ballard v. State*, 297 Ga. 248, 251 (4) (773 SE2d 254) (2015) (A motion to bifurcate "should be denied where the count charging [unlawful firearm possession] might serve as the underlying felony supporting a felony murder conviction." (citation and punctuation omitted)). Counsel was therefore not deficient for failing to request severance as to Count 12. See *Lee v. State*, 280 Ga. 521, 522 (2) (c) (630 SE2d 380) (2006) (no deficient performance in failing to seek severance of a firearm charge which was the predicate to a felony murder charge).

27

With regard to Count 13, bifurcation would also have been inappropriate in this case. Talley was charged with malice murder, and his status as a convicted felon would have allowed the jury to find him guilty of the lesser offense of felony murder (based on the felon-in-possession charge) even though Talley had not been charged separately with that crime. See *Cooks v. State*, 299 Ga. 787, 790 (3) (792 SE2d 389) (2016); *Jones v. State*, 265 Ga. 138, 139 (2) (454 SE2d 482) (1995). Because the trial court would not have been required to bifurcate Count 13, Talley has failed to show that his counsel's performance was deficient for failing to file such a motion. See *Moss*, 298 Ga. at 617 (5) (a). His claim of ineffective assistance therefore fails.

4. Finally, Talley asserts that the cumulative effect of the trial court's errors and his counsel's deficient performance prejudiced him such that his convictions should be reversed. Under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020), we must "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." Id. at 17

28

(1). To establish cumulative prejudice that warrants a new trial, Talley must show that "at least two errors were committed in the course of the trial; [and] considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [Talley] a fundamentally fair trial." (Citation and punctuation omitted.) Id. at 21 (4). However, when reviewing a claim of cumulative prejudice, "[w]e evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020) (citation and punctuation omitted).

This Court assumed for purposes of analysis that the trial court erred by admitting, over counsel's objection under Rule 807, evidence of Walker's statements to Glaze about a threat made by Talley against Walker and about the "criminal enterprise" in which Talley and Walker were engaged. We likewise assumed that trial counsel performed deficiently by not making objections to the same evidence under Rule 403 and Rule 404 (b).

However, as we discussed above, the evidence against Talley

was strong. Thus, as we did individually in regard to the assumed errors, and because they relate to the same testimony, we cannot say that the cumulative effect of the assumed evidentiary error and deficient performance resulted in prejudice to Talley such that a new trial is warranted. See *Stafford*, 312 Ga. at 824-825 (6) (no cumulative prejudice arising from assumed trial court errors and assumed deficiency on the part of trial counsel where evidence presented against defendant was strong and claim of ineffective assistance was based on failure to raise alternative objection to evidence the Court assumed was admitted in error).

*Judgment affirmed. All the Justices concur.*

Decided June 30, 2022.

Murder. Fulton Superior Court. Before Judge Adams.

*Garland Samuel & Loeb, Donald F. Samuel*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Virginia L. Davis, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.