**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: June 30, 2022

S22A0468. HOLLAND v. THE STATE.

BOGGS, Presiding Justice.

Appellant Leonard Holland challenges his 2008 convictions for malice murder and other crimes in connection with the shooting death of James Gary Jones.[1] Appellant contends that the trial court

---

[1] The crimes occurred on March 14, 2002. On November 12, 2004, a Fulton County grand jury indicted Appellant for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), aggravated assault with a deadly weapon (Count 4), possession of a firearm by a convicted felon (Count 5), theft by taking (Count 6), and possession of a firearm during the commission of a felony (Count 7). At a trial from November 10 to 17, 2008, the jury found Appellant guilty of all charges. The trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder, ten years consecutive to Count 1 for theft by taking, and five additional years consecutive to Count 6 for possession of a firearm during the commission of a felony. The court merged the remaining charges, although the felony murder counts were actually vacated by operation of law. Appellant filed a timely motion for new trial, which he amended with new counsel on September 3, 2019. The court held an evidentiary hearing on February 24, 2020, and denied the motion on October 12, 2021. Appellant filed a timely notice of appeal. The case was docketed in this Court to the April 2022 term and was submitted for a decision on the briefs.

erred by ruling that Appellant's video-recorded statements could be used for impeachment purposes, by admitting Appellant's written statements allegedly made in violation of *Miranda*,[2] and by admitting Appellant's written statements as similar-transaction evidence. Appellant further contends that he was denied the effective assistance of counsel in two respects and that the cumulative prejudicial effect of the trial court's and trial counsel's errors entitles him to a new trial under *State v. Lane*, 308 Ga. 10, 21-23 (4) (838 SE2d 808) (2020). For the reasons stated below, we affirm.

1. (a) The evidence at trial showed the following. During the evening of March 14, 2002, Jones arrived at his friend Victoria Gillespie's house, where Appellant and his friend Hussain Abdullah were already present. Jones had a rifle in a bag in his truck. Jones told Appellant that there was a person in the Capitol Homes public housing community who had some information on a potential robbery opportunity. Jones then drove Appellant and Abdullah

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

away from Gillespie's house. Once they were in his truck, Jones asked Appellant if he had a gun, but Appellant said no.

When they arrived at their destination, a house off of Sells Avenue in the West End neighborhood of Atlanta, Appellant told Abdullah to stay in the truck before Appellant and Jones began to walk up a driveway. Appellant then shot Jones once in the back of the head and twice in the torso, killing him. Appellant and Abdullah disposed of Jones' body a few miles away, and Appellant told Abdullah they needed to wipe down the truck. Appellant found a water bottle and rag inside the truck, which he and Abdullah used to clean the truck in an effort to remove any evidence. Appellant also found the rifle bag and put a gun from his waistband inside. Appellant then threw the rifle bag into a nearby trash can, and Abdullah threw the rag and water bottle on top of a nearby building. Appellant later went back with Abdullah and retrieved the rifle bag.

The next morning, Appellant went to Abdullah's house to explain why Appellant killed Jones. Appellant told Abdullah that there was a previous incident between Jones and Appellant and that

Jones had told a mutual friend that he was so mad he wanted to kill Appellant. Appellant also told Abdullah Jones had "ripped him off" over some money related to a previous robbery Appellant and he had committed. Appellant threatened Abdullah to not tell anyone, but on May 28, 2003, Abdullah told the police about Jones' murder and led them to the water bottle and rag, which were still on top of the building. Abdullah later testified against Appellant at trial. Appellant chose not to testify at trial.

(b) Appellant was arrested for murder late in the evening of August 13, 2004, and was taken to the Atlanta Police Department. Immediately following his arrest, Appellant was interviewed by Detective Bobby Render from the late evening of August 13 to the early morning of August 14. This interview was video-recorded. At the beginning of the interview, Appellant was read his rights under *Miranda.*

Detective Render suspected that Appellant was involved in several unsolved murders in addition to Jones' murder, and Appellant stated early in the interview, "My life as I know it is over

4

with." Before Appellant divulged any information about his involvement in any murder, however, Detective Render told Appellant, "You know what, listen, they only charge you with what they charge you with, so now we got just one. Gotta clear the rest up but you'll only get charged with one." Appellant then admitted multiple murders, including that of Jones. Detective Render told Appellant, "This is what they [the prosecutors] need bro. Full disclosure from you on everything. From any shooting, from any murder. Then we can go through and clear these files." Appellant stated, "Someone has to pay for these murders, man." Detective Render responded, "That's the pay. Call it what you want but that's the pay. We can clear it. We've got 20 murders, not saying you did all 20 but if you are claiming 20 – bro, come on – 20 for 1, that's the f***ing deal of the century." Appellant then divulged specific details about each of the murders he committed.

(c) More than a month later, on September 17, 2004, Detective Render interviewed Appellant at the Fulton County Detention Center after Appellant called Detective Render's office and left a

5

voicemail asking him to visit Appellant at the jail. Appellant was advised of his rights under *Miranda* and initialed and signed a written waiver. Appellant then wrote out the details of several of the crimes he previously admitted to during his video-recorded interview on August 13 to 14. In what would become State's Exhibit 3-A, Appellant wrote down a list of several homicides he was involved in, including the death of Jones. In what would become State's Exhibit 3-B, Appellant listed his fellow gang members.

(d) Appellant met with Detective Render nine more times between September 2004 and March 2006. Appellant initiated contact with Detective Render before each of these meetings, and at each meeting, Appellant signed a waiver of rights form. At one of these later meetings, Appellant wrote what would later become State's Exhibit 14, which described in detail the multiple homicides other than that of Jones that Appellant and his fellow gang members had committed that Appellant previously admitted to during his video-recorded interview and in Exhibit 3-A. On the front of Exhibit 14, Appellant wrote the words "Volunteered Information," and he

6

underlined them three times. At the bottom of the exhibit, Appellant wrote, "I agree to a videotape to show participants that I am cooperating and that I have turned State's Evidence."

(e) Before trial, Appellant filed a motion to suppress all the statements he made to the police. This included the video-recorded statement that he gave on August 13 to 14, 2004, as well as State's Exhibits 3-A, 3-B, and 14. After Appellant filed this motion, he and the State stipulated that the video-recorded statement made on August 13 to 14, was obtained because the detective provided an improper hope of benefit and that the video was therefore inadmissible as substantive evidence at trial but could be used to impeach Appellant if he were to testify inconsistently. The trial court entered a consent order reflecting the parties' stipulation. Appellant did not testify at trial, so the video recording was never introduced.

On November 30, 2007, the trial court held a hearing on whether to suppress Appellant's written statements. The hearing continued on December 4, 2007. The trial court denied the motion to

suppress, finding that Appellant initiated contact with Detective Render in each instance prior to their meetings and holding that the written statements contained in Exhibits 3-A, 3-B, and 14 were made "voluntarily with full knowledge of the defendant's constitutional rights to counsel."

Appellant later filed another motion to suppress the statements contained in what became Exhibits 3-A, 3-B, and 14. On October 17, 2008, the trial court held another suppression hearing. At the end of the hearing, the trial court determined that

> [b]ased on the totality of the evidence and the point that at some point your client initiated contact with the detective, the numerous waiver of counsel forms, and the handwriting of your client on State's 14 that ["]I agree to a videotape to show participants that I am cooperating, that I have turned State's evidence,["] I'm going to rule that your client clearly knew [what] he was providing[. I]n concert with a waiver of counsel and with a notice that what he said could and would be used against him in a court of law, a reasonable person wouldn't have an expectation of confidentiality.

The trial court then denied Appellant's second motion to suppress his statements in Exhibits 3-A, 3-B, and 14.

The State also filed a notice of intent to present evidence of 13

similar transactions, including Appellant's previous convictions as well as evidence of his involvement in several murders in which he was a suspect but had not been indicted. As part of its evidence, the State intended to introduce Exhibits 3-A, 3-B, and 14, in which Appellant confessed to being a part of several murders alongside his fellow gang members. A similar-transaction hearing took place on November 30, 2007, and continued on December 4, 2007. After reviewing the evidence and arguments, the trial court found that the State's listed purposes of course of conduct, intent, and motive were valid purposes and that the State met the requirements to introduce similar-transaction evidence under former Uniform Rule of Superior Court 31.3 (B).[3] The trial court also found "that there exists a logical connection (as well as sufficient similarity) between the listed Similar Transactions and the indicted charges." Specifically, the trial court noted that

> all the Similars occurred in Fulton County, Georgia; they all involved at least one other accomplice; all the victim's [sic] were adults; all were done with a deadly weapon; and

---

[3] Appellant was tried under the old Evidence Code. Uniform Superior Court Rule 31.3 was deleted after the current Evidence Code went into effect.

all show a course of conduct to protect or promote criminal activity.

The State later introduced Exhibits 3-A, 3-B, and 14 as similar-transaction evidence at trial.

2. Appellant challenges the trial court's rulings regarding the admissibility of several oral and written statements he made to Detective Render.

(a) Appellant contends the trial court erred in entering the consent order allowing his video-recorded statement to be used for impeachment purposes, which he says deprived him of his constitutional right to testify in his own defense. Appellant claims on appeal that he did not testify solely because of the order and his fear of being impeached by his video-recorded statement. However, Appellant has not shown that the trial court's entering of the consent order was the primary reason he did not testify. See *Linares v. State*, 266 Ga. 812, 814-815 (3) (471 SE2d 208) (1996) (declining to review defendant's claim that trial court's ruling that his involuntary statement could be used for impeachment violated his

10

constitutional right to testify when defendant chose not to testify and defendant did not show the trial court erred in finding the ruling was not the primary factor in his decision not to testify). Although Appellant submitted an affidavit at the motion for new trial hearing claiming the trial court's entering of the consent order was the reason he did not testify, the trial court found the affidavit not credible. See *Espinosa v. State*, 265 Ga. 171, 172 (1) (454 SE2d 765) (1995) (trial court's factual findings about witness credibility should be accepted unless clearly erroneous). Because the trial court's finding that Appellant was not credible in saying he would have testified in his own defense but for the entering of the consent order was not clearly erroneous, we reject this enumeration of error, as any review of Appellant's claim on this basis would be speculative. See *Linares*, 266 Ga. at 814-815 (3).

(b) Appellant contends that the trial court erred in denying his motion to suppress State's Exhibits 3-A, 3-B, and 14, because Detective Render's promises to keep the information "off the record" nullified the previously given *Miranda* warnings and made

11

Appellant's statements inadmissible. In support of his claim, Appellant points to this Court's decision in *State v. Clark*, 301 Ga. 7 (799 SE2d 192) (2017), where we held that a detective's "affirmative agreement to keep the discussion off the record had the effect of nullifying the *Miranda* warning previously given" to the defendant. *Clark*, 301 Ga. at 12 (2) (citations and punctuation omitted).[4] But the trial court in *Clark* found that the detective there "made little or no effort to ensure [the defendant] understood his rights" and that the defendant "could have reasonably understood the detective's affirmation to mean that the interview was in fact off the record" and confidential. Id. at 10 (1) (punctuation omitted). In contrast, the record here does not support Appellant's claim.

Appellant provided State's Exhibits 3-A and 3-B to Detective Render during the meeting on September 17, 2004. Detective Render advised Appellant of his rights under *Miranda* at the

---

[4] Appellant also cites this Court's decision in *Spence v. State*, 281 Ga. 697 (642 SE2d 856) (2007), where we held that a detective's unequivocal promise that interrogation was "confidential" nullified a previous *Miranda* warning and rendered the defendant's confession involuntary. *Spence*, 281 Ga. at 699 (2).

beginning of the interview. Detective Render testified at a suppression hearing that Appellant offered to provide him information, in writing, on a number of murders that he had been involved in but that he "didn't want it to be turned in at that time, basically," until he could provide Detective Render with "additional information" about the homicides so that the detective could verify the information. Detective Render agreed to this. According to Detective Render, Appellant described this as keeping the statement "off the record." However, in context, it was clear that there was no promise by Detective Render that Exhibits 3-A and 3-B would never be used against Appellant. As the trial court found in its order denying Appellant's first motion to suppress, "[n]o promises were made that these statements would not be used against [Appellant]." Rather, Exhibits 3-A and 3-B were only to be held until "more details were given at a later date."[5] And, when asked at a suppression hearing if it was his "expectation . . . that this information would

---

[5] Appellant did provide these details at a later date when he produced what would become State's Exhibit 14.

13

come to the district attorney's office," Appellant himself stated, "[w]ell, I mean, eventually I figured that's what would happen."

At a later meeting, Detective Render again advised Appellant of his rights under *Miranda*, and Appellant provided him with State's Exhibit 14, which detailed the homicides Appellant previously admitted in Exhibit 3-A.[6] Appellant claims that Detective Render agreed to "hold out" Exhibit 14. But Detective Render explicitly denied this claim, and when asked at a suppression hearing, "[w]hen State's [Exhibit] 14, with the details, was filled out, [if] any promises [were] made to the defendant," Detective Render said, "[t]here were no promises." Moreover, Appellant wrote the words, "Volunteered Information," which he underlined three times, on the front of State's Exhibit 14, and at the end, he wrote, "I agree to a videotape to show participants that I am cooperating and that I have turned State's evidence." In denying suppression, the trial court found, based on the totality of the evidence, that "no promises

---

[6] In fact, when asked at the suppression hearing, "How many times total do you think you read him his rights?" Detective Render responded, "Probably in – [sic] I guess between either statements, forms, 30 or more times."

of confidentiality" were made to Appellant. We conclude that the trial court's finding that no unequivocal promises of confidentiality were made is supported by the record. Consequently, Appellant's claim fails. See *Drake v. State*, 296 Ga. 286, 288 (2) (2014) (trial court's factual findings on a motion to suppress must be upheld unless clearly erroneous).

(c) Appellant also contends the trial court erred in admitting Exhibits 3-A, 3-B, and 14 as similar-transaction evidence. Under the old Evidence Code, which applied to Appellant's 2008 trial, the following requirements applied:

> before any evidence of independent offenses or acts may be admitted into evidence, a hearing must be held pursuant to Uniform Superior Court Rule 31.3 (B). At that hearing, the state must make three affirmative showings as to each independent offense or act it seeks to introduce. The first of these affirmative showings is that the state seeks to introduce evidence of the independent offense of act, not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of admissibility. . . .
>
> The second affirmative showing is that there is sufficient evidence to establish that the accused committed the independent offense or act. The third is

that there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter. . . .

[At the hearing, t]he state must present the trier of fact with evidence establishing both that the accused committed an independent offense or act and that the connections and/or similarity between that offense or act and the crime charged is such that proof that the accused committed the former tends to prove that the accused also committed the later.

*Williams v. State*, 261 Ga. 640, 642 (b) (c) (409 SE2d 649) (1991) (citations and punctuation omitted).

(i) Appellant first alleges that the State failed to articulate the purpose for which it was introducing each independent offense, failed to prove Appellant committed the independent offenses, and failed to show sufficient similarities between the independent offenses and the present charges. We disagree.

At the pretrial hearing, the State explained that it intended to introduce Exhibits 3-A, 3-B, and 14 as similar-transaction evidence for the purposes of showing intent, motive, and course of conduct – all proper purposes at the time. See *Smith v. State*, 273 Ga. 356, 357 (2) (541 SE2d 362) (2001) (holding intent, motive, and course of

16

conduct were proper purposes for similar-transaction evidence under the old Evidence Code). As the trial court set out in its order admitting Exhibits 3-A, 3-B, and 14 as similar-transaction evidence, the victim's murder was similar to the homicides Appellant admitted to in the exhibits. Specifically, the trial court noted that, like Jones' murder, all the similar transactions occurred in Fulton County, were murders of adults, involved use of a deadly weapon, were committed against known associates of Appellant, and showed a course of conduct to commit or protect a criminal activity. See *Agee v. State*, 279 Ga. 774, 776 (3) (621 SE2d 434) (2005) (sufficient similarities existed where, in both the crime charged and the independent offenses, the defendant used a handgun, shot the victims as they attempted to flee, and fired the weapon numerous times); *Gardner v. State*, 273 Ga. 809, 811 (2) (546 SE2d 490) (2001) (sufficient similarities existed where, in both the crime charged and the independent offenses, the defendant used a handgun, committed the offense at night and with little or no provocation, had others with him, fled the scene, and attempted to cause serious injury or death).

Because evidence in the record supports the trial court's finding of similarity, the admission of the exhibits as similar-transaction evidence was not an abuse of discretion. See *Smith*, 273 Ga. at 357 (2) ("An appellate court should not disturb the findings of the trial court on the issue of similarity or connection of similar-transaction evidence unless they are clearly erroneous." (citations and punctuation omitted)); see also *Strong v. State*, 309 Ga. 295, 310 (2) (d) (1) (845 SE2d 653) (2020) (explaining that while Georgia's current Evidence Code requires courts to consider similarities and differences between extrinsic acts and the charged crime, the old Evidence Code only required courts to consider similarities).

(ii) Appellant also alleges that Exhibits 3-A, 3-B, and 14 were improperly admitted as similar-transaction evidence because they were "fruit of the poisonous tree" from the video-recorded statement, which was induced by an improper hope of benefit.[7] Appellant

---

[7] To the extent that Appellant is arguing that Exhibits 3-A, 3-B, and 14 themselves were induced by an improper hope of benefit under former OCGA § 24-3-50, the record supports the trial court's findings, based on Detective Render's testimony, "that any promises or hope of benefit that may have been

18

specifically points to Detective Render's promise during Appellant's video-recorded statement – that Appellant would not be charged with any additional crimes he divulged – as "the poisonous tree" that tainted the exhibits as involuntary and rendered them wholly inadmissible, even as similar-transaction evidence. However, while Detective Render's promise that Appellant would not be charged with the additional crimes was unquestionably a hope of benefit under former OCGA § 24-3-50,[8] the "fruit of the poisonous tree" doctrine does not apply to violations of that statute, so Appellant's claim is meritless. See *State v. Chulpayev*, 296 Ga. 764, 784 (3) (b) (770 SE2d 808) (2015).

3. Appellant contends he was denied the effective assistance of trial counsel. To prevail on this claim, Appellant must prove both that his lawyer was professionally deficient and that he was

given to [Appellant] during the August video-taped interview had been clearly rescinded at the subsequent interviews and no promises were made at any of the subsequent interviews" and that the written statements were made "voluntarily."

[8] Former OCGA § 24-3-50, which was in effect at the time of Appellant's trial, was carried over into current OCGA § 24-8-824 and states: 'To make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."

19

prejudiced by this defective performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, he must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013) (citation and punctuation omitted). This requires Appellant to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015) (citation and punctuation omitted). Importantly, "[i]n the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Lanier v. State*, 310 Ga. 520, 526 (3) (b) (852 SE2d 509) (2020) (citation and punctuation omitted). And to prove prejudice, Appellant "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). "If either *Strickland* prong is not met, this Court need not examine the other prong." *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018) (citation omitted).

(a) Appellant asserts that his trial counsel rendered ineffective assistance by agreeing to the consent order allowing his video-recorded statement to be used for impeachment purposes. Pretermitting whether trial counsel performed deficiently in agreeing to the consent order, Appellant has failed to carry his burden to show prejudice. As discussed in Division 2 (a) above, Appellant has not shown that he would have testified but for the consent order. Moreover, he did not testify at the motion for new trial hearing to show what his testimony would have been, and his affidavit likewise did not describe what his testimony would have been. Thus, he failed to show that the consent order had any prejudicial effect on his trial. See *Manriquez v. State*, 285 Ga. 880,

881 (2) (684 SE2d 650) (2009) (defendant cannot rely on speculation to prove prejudice prong of ineffective assistance of counsel claim). Further, the State presented overwhelming evidence against Appellant that implicated him in the murder of Jones: Abdullah testified that Appellant murdered Jones in Abdullah's presence; Detective Render testified and recounted Appellant's multiple confessions to Jones' murder in several of their meetings; and the State presented the physical evidence of Appellant's disposal of Jones' body, including the water bottle and the rag. In light of the evidence presented at trial, Appellant cannot show a reasonable probability that the outcome of the trial would have been different if his trial counsel had not agreed to the consent order, so his first claim of ineffective assistance fails.

(b) Appellant also contends he was denied the effective assistance of counsel when his trial counsel failed to object or move for a mistrial when the court declined to question the jury after two alleged jury issues. During a recess after closing arguments, the prosecutor informed the trial court that it was possible a juror

overheard someone from the prosecution team discussing the case during a recess. After the court asked trial counsel whether he would like the court to question the panel, trial counsel responded, "I don't want to – I, frankly, don't want to make a bigger deal of it. It's probably not a big deal." When the court asked if trial counsel wanted the court to ask the jurors if they overheard anything during the break, trial counsel responded, "Sure, and I'm assuming you'll tell them to disregard anything." The court subsequently told the jury:

> Ladies and gentlemen, when you left after closings, I didn't give you my admonition. Be extremely careful in this case. I don't want you to learn anything from any other source except what you already learned in the jury room – what you learned in the courtroom. I obviously am getting tired when I make mistakes like that. If any of you have overheard anything about this case, including accidentally during the last break, because someone reported to me, as they're required to do, that they think they may have been discussing the case in the wrong place. . . . I always give two orders. One, report it to a deputy; [a]nd, two, don't discuss it with other jurors.

No jurors reported overhearing anything. Trial counsel later told the court that "we have no problem – your honor explained to the jury if

they heard, overheard anything. I have no objection to that."

During jury deliberations, a juror sent the following note to the court:

> Judge, I have reason to believe that a juror could have been compromised. This is due to [a] complete turn around from the juror's previous stance and a complete refusal to change their mind.

The court showed the note to both trial counsel and the prosecutor and added, "No fact is offered up, just, quote, their feeling, end quote." Trial counsel told the court, "I don't know what to do, to be honest." The court decided then that no further action should be taken and stated in open court:

> I have read and gone over the note concerning whether or not some of the jurors have been changing their mind and refusing to change their mind and whatever their stance. Both the prosecution and the defense agree that based on this note alone, no one is requesting further action.

The court also determined that there was no evidence "that anyone's not deliberating." The jury came back with a verdict shortly thereafter.

We conclude the record supports that trial counsel's decisions

24

were the result of trial strategy that was professionally reasonable. After the court became aware that a juror potentially overheard the prosecution's conversation during recess, the court gave an explicit curative instruction to the jury to report any external communications they may have heard to a deputy, to not discuss any external communications with any other juror, and to only consider evidence presented in the courtroom. "Qualified jurors under oath are presumed to follow the trial court's instructions." *Smith v. State*, 267 Ga. 372, 374 (3) (477 SE2d 827) (1996). Trial counsel testified at the motion for new trial hearing that, in light of the curative instruction, his decision not to request further action was strategic, as he did not want to bring greater attention to the incident.

Further, the juror's note during deliberations was based on pure speculation and contained no direct evidence of any outside influence on the jury. Trial counsel also testified that his decision not to request any action by the court was strategic, as the note could have even meant "a potential of a juror swinging in our direction." In each instance, trial counsel made a reasonable strategic decision

and was not deficient, and, thus, this enumeration lacks merit. See *Bozzie v. State*, 302 Ga. 704, 711 (4) (c) (808 SE2d 671) (2017) (trial counsel not deficient for failing to pursue questioning of juror after alleged improper jury communication where there was a lack of evidence anything inappropriate happened and because he thought juror may be sympathetic to defense).

4. Appellant contends that, under *Lane*, 308 Ga. at 21-23 (4), the combined prejudicial effect of the trial court's errors and trial counsel's deficiencies affected the outcome of the trial. For the purposes of this *Lane* analysis, the presumed deficient performance of counsel is agreeing to the consent order that allowed Appellant's video-recorded statement to be used for impeachment. However, "to establish cumulative error, Appellant must show that . . . at least two errors were committed in the course of the trial." *Flood v. State*, 311 Ga. 800, 808 (2) (d) (800 SE2d 731) (2021) (citation and punctuation omitted). Since there are no other presumed trial court errors or trial counsel deficiencies to aggregate, cumulative error analysis under *Lane* is not applicable.

*Judgment affirmed. All the Justices concur.*