**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**GOBEIL and LAND, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**December 9, 2022**

# In the Court of Appeals of Georgia

A22A1264. AITKEN v. THE STATE.

McFADDEN, Presiding Judge.

After a jury trial, David Francis Aitken was convicted of multiple counts of child molestation and aggravated child molestation for acts against J. P. and R. B. He argues on appeal that his trial counsel was ineffective in three respects, but as to one of his assertions he has not shown deficient performance and, as to the other two, he has not shown prejudice arising from those asserted deficiencies. Aitken also argues that the trial court erred in his response to the state's allegedly improper closing argument, but we find no error because the closing argument fell within permissible bounds. So we affirm.

1. *Facts.*

"Because this case requires an assessment of . . . whether trial counsel's performance resulted in prejudice to [Aitken], we lay out the evidence in detail and not only in the light most favorable to the jury's verdict[ ]." *Talley v. State*, 314 Ga. 153, 154 (1) n. 2 (875 SE2d 789) (2022).

In 2006, Aitken became involved in the skateboarding community in Atlanta. He started a skateboard company, sponsored teams for skaters (including pre-teens and teenagers), and built a skateboard park near his loft apartment. Skaters regularly spent time and stayed the night at Aitken's loft. There skaters, including those who were underage, drank alcohol and smoked marijuana at the loft. Aitken sometimes offered skaters what he called a "hangover pill." Conflicting evidence was presented about whether that pill was a probiotic or was Xanax, a prescription medication that has a sedative effect and can make a person feel drowsy and lethargic and have poor muscle control, especially when combined with alcohol.

(a) *R. B.*

R. B. joined one of Aitken's skateboard teams in 2006 when he was ten years old, and he began spending time and sometimes sleeping over at the loft. Although R. B. later left the team for a better sponsorship opportunity, he continued to spend time with Aitken at the loft. R. B. testified that, while there, he smoked marijuana and

drank alcohol provided by Aitken, including a "house drink" he described as "a smaller Corona filled to the brim with tequila and lime" that the drinker would "chug."

R. B. testified that, when he was around 12 years old, he fell asleep at the loft after drinking and smoking. No other skaters were at the loft that night. (Indeed, Aitken sometimes told others to leave when R. B. came over.) R. B. awoke to a camera flash and found his blanket pulled away from him. The blanket then was placed back on him. Because it was dark, R. B. could not see who had pulled the blanket off of him. He did not know what to do or how to feel about this incident, and he did not say anything about it the next day.

R. B. testified that, soon after this first incident, when R. B. was still 12 years old, he had been drinking alcohol and smoking marijuana with Aitken and one of Aitken's friends at the loft, and Aitken told him to take a "hangover pill." R. B. was drunk and the pill made him feel like he did not have control over his body. He fell asleep on a couch but awoke as Aitken's friend was leaving. Aitken and R. B. then began play wrestling on the couch. Aitken pinned R. B. down, pulled down his pants, and performed oral sex on him, causing the boy to ejaculate. Aitken also put R. B.'s

3

hand on his penis. R. B. was shocked. He testified that the incident "didn't feel real" and that he "didn't want it to be real."

R. B. testified that he returned to Aitken's loft "to continue doing the skateboarding and [because he] liked the part of the drinking and smoking weed." Another incident occurred a short time later. R. B. had been drinking the "house drink" earlier in the day and Aitken told him to take a "hangover pill," which Aitken left on the bathroom counter. R. B. did not take the pill. After falling asleep in Aitken's bed, R. B. awoke to find Aitken touching his penis, beneath R. B.'s clothing, with his hand. R. B. moved slightly and saw Aitken pull back and "just watch [him]." R. B., who was very intoxicated, fell back to sleep. The next morning, Aitken became very angry after he saw that R. B. had not taken the "hangover pill."

In 2009, when he was 13, R. B. drank to excess while staying at a house that Aitken had rented for a skateboarding competition in Florida. After that incident, R. B. spent less time around Aitken, and in 2011 R. B. stopped going to Aitken's loft after his mother discovered that he had taken a significant amount of marijuana from there.

As he entered his teens, R. B.'s demeanor changed. He began acting out to his parents and abusing alcohol, and he got into legal trouble for running away from home. He also suffered from anxiety and depression.

During an emotional conversation with his girlfriend in the spring of 2012, when R. B. was 16 years old, he revealed that Aitken had molested him. R. B. told his girlfriend that he thought Aitken's actions were the root of his issues with anxiety and depression. R. B. then told his father what had happened. In June 2012 he filed a police report and later gave a forensic interview in which he described the abuse.

After R. B.'s outcry, rumors began to circulate in the skateboarding community that Aitken had molested a skater. In 2014, R. B. ran into two other skaters (including the other victim, J. P.) at a restaurant, and when the conversation turned to those rumors, a tearful R. B. revealed that he was the person who had been molested.

R. B. had no further communication with Aitken after his outcry. He continued to struggle behaviorally and abuse alcohol, and he spent some time in a rehabilitation program. His treatment records from that program show behavior that, in the opinion of an expert in child sexual disclosures and forensic psychotherapy, was consistent with child sexual abuse.

At trial, Aitken denied R. B.'s allegations of abuse. Defense counsel presented evidence and elicited testimony challenging aspects of R. B.'s outcry, such as the timing of the alleged incidents, the way R. B. behaved and interacted with Aitken at the loft, and other details of his reports of abuse. Defense counsel also presented evidence and elicited testimony challenging R. B.'s credibility on other points, such as his high school grades, his reasons for leaving a private school, the extent of his drug and alcohol use, and the circumstances surrounding the incident in which R. B. took marijuana from Aitken.

(b) *J. P.*

J. P. met Aitken in 2006, when he was around 11 years old. At that time J. P. was already a competitive skater with sponsors. He did not skate on Aitken's teams, but he spent a lot of time with friends at Aitken's loft.

J. P. testified that drinking occurred most of the time he was at the loft, and he and some other persons present at the loft testified that Aitken gave J. P. marijuana, alcohol (including the "house drink"), and Xanax. Aitken sometimes play wrestled with J. P. at the loft in a way that an eyewitness testified made him uncomfortable.

J. P. testified that on one occasion when he was no older than 12, he took either Xanax or Ambien and smoked marijuana with Aitken while in Aitken's bed. Aitken

6

began playing a pornographic video and he asked J. P. what the boy thought about it. Aitken then put his hand down J. P.'s shorts and touched the boy's erect penis, and he made J. P. touch his erect penis. J. P. testified that "in [his] head [he] convinced himself [the incident] didn't happen. This guy that was [his] friend won't do that to [him]."

J. P. testified that a second incident occurred at a party at Aitken's loft when he was 13 or 14 years old. J. P. became very "messed up" (in the words of an eyewitness) after consuming four or five Xanax pills, and Aitken took J. P. to his bedroom where the boy passed out. J. P. later awoke to find himself on his stomach with his pants pushed down to his ankles. Aitken was on top of him, with his penis in J. P.'s anus. J. P., in his words, "freaked out." He pushed Aitken off of him and went into the bathroom, where he wiped semen off of his body. J. P. had no memory of leaving the bathroom that night.

J. P. testified that the next day he felt physically ill and was terrified. He stopped going to the loft, and on later occasions when he encountered Aitken he again became physically ill. Other witnesses corroborated this testimony. J. P.'s mother testified that she saw J. P. throw up after learning that he and Aitken were at the same skateboarding event. And another skater testified that he saw J. P. get sick on an

7

occasion, after the abuse had occurred, when J. P. went with the witness to Aitken's loft.

J. P. testified that he did not tell anyone about the abuse at that time because he "didn't want people to know that something like that happened to [him]." Over the years, J. P. was asked by his parents and others (including the prosecutor in R. B.'s case) if Aitken had done anything to him, but he denied any abuse.

In 2013, J. P. learned about the molestation allegations involving R. B. and, in his mother's words, went "off the deep end." His demeanor changed, he did not sleep, and he would hit things. His drug use became progressively worse, and he began regularly using heroin. He stopped skateboarding, went to rehabilitation programs, and received other treatment and therapy for his addictions. His treatment records show behavior that, in the opinion of an expert in child sexual disclosures and forensic psychotherapy, was consistent with child sexual abuse.

J. P. was arrested for a drug offense in late December 2015, and the following February he got into a confrontation with his mother about his drug use. When pushed by his mother to explain his behavior, J. P. screamed at her: "How would you feel if you were raped?" This led to J. P.'s outcry to his mother and other family members. J. P.'s mother reached out to the prosecutor involved in R. B.'s case. J. P.

8

gave a police interview but, due to his age at the time of his outcry, he did not give a forensic interview.

At trial, Aitken denied J. P.'s allegations of abuse. Defense counsel presented evidence and elicited testimony to challenge both J. P.'s credibility generally and specific aspects of his outcry. Those efforts included pointing out that, on several occasions before his outcry, J. P. had denied being abused by Aitken; suggesting that J. P. was testifying in the hopes of getting lenient treatment in connection with his pending criminal drug charges; presenting evidence of positive interactions between J. P. and Aitken during the time of the alleged abuse; and noting inconsistencies in J. P.'s testimony and prior statements regarding things such as the timing of his outcry and details about the abuse.

(c) *Police investigation and Aitken's subsequent actions.*

Law enforcement began investigating Aitken in the summer of 2012, after R. B. reported his abuse. A police investigator interviewed Aitken in September 2012 and informed him of R. B.'s allegations. Later that month, Aitken sold the skateboard company.

The investigator got a search warrant for records of the skateboard company and spoke with Aitken about arranging a time to meet to execute it. Aitken told the

investigator he would have to get back to him about a meeting time. After several subsequent, unsuccessful attempts to reach Aitken to execute the search warrant, the investigator obtained a warrant for Aitken's arrest.

On November 28, 2012, law enforcement officers went to the loft to execute the arrest warrant, another search warrant for the skateboard company, and a search warrant for the loft. Among other things, they found Xanax in Aitken's bedroom. And they found computer equipment and other electronic devices; a forensic search of the computers and devices revealed nothing of evidentiary value on them.

At the time of the search, Aitken was on a business trip in Utah. His housemate, who was present during the search, testified that he called Aitken to tell him about it and that Aitken said he would "catch the next flight back to Atlanta." Aitken testified that he spoke with his housemate that day but said that he would return later in the week. He also testified that, after speaking with his housemate, he immediately called the law enforcement officer who had interviewed him in September.

Instead of returning to Atlanta, Aitken left the country. He flew from Utah to Mexico on November 28, 2012, and from there traveled to Costa Rica. Aitken stopped using his cellular phone and credit cards. He also obtained a false, photocopied passport under another name, which he used as identification in

situations that did not legally require a passport. (He continued to use his real passport to travel between countries. ) Aitken testified at trial that he took these actions to protect his privacy and to avoid arrest while he "figure[d] out what was going on."

In June 2013, Aitken was apprehended in Panama and taken back to the United States.

2. *Ineffective assistance of counsel.*

Aitken argues that he received constitutionally ineffective assistance of trial counsel. To prevail on this claim, he

> must demonstrate both that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. To establish deficient performance, [he] must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in light of prevailing professional norms. . . . To establish prejudice, [he] must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different.

*Bonner v. State*, __ Ga. __ (1) (__ SE2d __) (Case No. S22A0789, decided Aug. 23, 2022) (citations omitted). On appellate review, we "accept[ ] a trial court's factual findings and credibility determinations on an ineffectiveness claim unless they are

11

clearly erroneous, but we apply legal principles to the facts de novo." Id. at __ (1) (citation and punctuation omitted).

(a) *Failure to cross-examine J. P. on false statements to the police.*

In March 2016, J. P. was arrested for theft of a controlled substance. Aitken asserts that J. P. gave false statements to law enforcement during that arrest, and he argues that his trial counsel was deficient for failing to cross-examine J. P. on those statements under OCGA § 24-6-608 (b) (1) (permitting cross-examination of a witness regarding specific instances of conduct concerning the witness's character for truthfulness or untruthfulness). We disagree.

In the first place, "OCGA § 24-6-608 (b) places the decision whether to admit specific instances of conduct within the trial court's discretion[.]" *Douglas v. State*, 340 Ga. App. 168, 172 (2) (796 SE2d 893) (2017) (citations and punctuation omitted). See OCGA § 24-6-608 (b) (1) (permitting such evidence "in the discretion of the court"). In denying Aitken's motion for new trial, the trial court stated that he would *not* have permitted this particular line of cross-examination, and we are not persuaded by Aitken's argument that such a ruling would have been a clear abuse of discretion. Trial counsel thoroughly tested J. P.'s credibility through other avenues of cross-examination, satisfying any Sixth Amendment concerns. See *United States*

12

*v. Burke*, 738 F2d 1225, 1227 (1) (11th Cir. 1984) (while a trial court "must permit sufficient cross-examination to satisfy the confrontation clause of the sixth amendment[, that] clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witness['s] credibility") (citations omitted). "Because [Aitken] has failed to establish that questions regarding [J. P.'s statements to police during his March 2016 arrest] would have been allowed at trial, he has not carried his burden to show that trial counsel performed deficiently." *Flannigan v. State*, 305 Ga. 57, 61 (2) (b) (823 SE2d 743) (2019).

Moreover, even though Aitken's trial counsel testified at the new trial hearing that he had no strategic reason for failing to pursue impeachment of J. P. in this manner, that testimony is not enough to overcome the strong presumption of reasonable performance by showing that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Clark v. State*, __ Ga. __, __ (2) (a) (__ SE2d __) (Case No. S22A0630, decided Oct. 25, 2022) (citation and punctuation omitted). See *Jones v. State*, 292 Ga. 593, 601 (7) (d) n. 7 (740 SE2d 147) (2013) ("proper assessment of the performance of counsel calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind[, so] although the thinking of the lawyer may be

13

relevant to our inquiry, . . . our inquiry properly is focused on what the lawyer did or did not do, not what he thought or did not think") (citations and punctuation omitted). "Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel[,]" *Payne v. State*, 314 Ga. 322, 332 (3) (f) (877 SE2d 202) (2022) (citation and punctuation omitted), and we cannot say that trial counsel's decision not to cross-examine J. P. about inconsistent statements that he made to police in an unrelated matter was "so patently unreasonable that no competent attorney would have followed such a course[,]" *Clark*, __ Ga. at __ (2) (a) (citation and punctuation omitted), especially given trial counsel's robust efforts to challenge J. P.'s credibility in other ways.

Finally, it is true, as Aitken argues, that we must also consider if trial counsel's alleged failures "resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy." *McLaughlin v. State*, 338 Ga. App. 1, 11 (1) (b) (789 SE2d 247) (2016) (citation and punctuation omitted). But nothing in the record suggests that inadequate preparation was behind the failure of Aitken's trial counsel to cross-examine J. P. on the statements he made during his March 2016 arrest.

14

For these reasons, we conclude that Aitken has not met his burden of showing that his trial counsel performed deficiently in not cross-examining J. P. on that topic, and so he has not demonstrated that he received ineffective assistance of counsel.

(b) *Failure to introduce evidence regarding the authenticity of R. B.'s Facebook post.*

Aitken argues that his trial counsel was ineffective for failing to introduce expert testimony on the authenticity of a Facebook post that R. B. sent Aitken shortly after R. B. took marijuana from Aitken's loft. In that post, which was not admitted at trial but was included in the record for purposes of appeal, R. B. apologized to Aitken for stealing from him, expressed admiration and respect for him, and stated that he trusted him. The defense sought to use the Facebook post to discredit R. B. and undermine his outcry.

Aitken's trial counsel tried to admit the post into evidence as an exhibit during Aitken's trial testimony. At that point in the trial, both R. B. and Aitken had already testified about the post. R. B. testified that he wrote Aitken a message apologizing for taking the marijuana, but he did not recall specific details about the message. When shown the Facebook post, R. B. testified that he did not recognize it and did not recall writing it, but he agreed that he "probably said" some of the comments found in that

15

post, including that he respected, trusted, and looked up to Aitken. Aitken testified that R. B. had sent him an apology via Facebook and identified the Facebook post as a true and accurate copy of the message R. B. had sent him.

The trial court sustained the state's objection to the admission of the Facebook post on hearsay grounds. When Aitken's trial counsel argued that the purpose of the exhibit was to establish that R. B. had made prior inconsistent statements, the trial court responded that counsel could ask Aitken about the post but that the court was "not going to admit the whole exhibit." Trial counsel went on to ask Aitken questions about the post.

During closing argument, the state questioned the authenticity of the Facebook post, stating that R. B. "could not authenticate [it] on the stand probably because it's not a real Facebook message." In fact, before trial Aitken's trial counsel had obtained an expert opinion that the message *was* authentic, but he did not present that evidence at trial. Trial counsel testified at the hearing on the motion for new trial that he had no strategic reason for not presenting the authentication evidence and characterized it as a "complete screwup on [his] part."

Aitken argues that, had his trial counsel presented the authentication evidence, he would have succeeded in getting the Facebook post admitted as a trial exhibit. But

16

we need not decide whether this failure constituted deficient performance. Even assuming that the trial court would have admitted the Facebook post as an exhibit had trial counsel presented the authentication evidence, Aitken has not shown a reasonable probability that the outcome of the trial would have been different.

Although R. B. did not recall the specific Facebook post, he did recall sending Aitken a written apology and he testified that his apology likely would have included many of the statements from the post that were most damaging to his credibility, such as the statements that he respected and trusted Aitken. Trial counsel also presented other evidence that challenged both R. B.'s credibility generally and the credibility of his outcry in particular, such as pointing out inconsistencies between R. B.'s trial testimony, his statements to police, and his statements to the forensic interviewer.

Finally, there was other strong evidence of Aitken's guilt, including eyewitness descriptions of activities at the loft; J. P.'s testimony about the similar acts that Aitken had committed against him, see OCGA § 24-4-414 (a) ("In a criminal proceeding in which the accused is accused of an offense of child molestation, evidence of the accused's commission of another offense of child molestation shall be admissible and may be considered for its bearing on any matter to which it is relevant."); and the evidence of Aitken's flight to avoid arrest. See *Garay v. State*, 314 Ga. 16, 20 (2)

17

(875 SE2d 631) (2022) (evidence of a defendant's flight is circumstantial evidence of his consciousness of guilt). "[G]iven the strong evidence of his guilt, [Aitken] has not demonstrated that his trial counsel's failure to [present the authentication evidence] affected the jury's verdict." *Mohamed v. State*, 307 Ga. 89, 94 (3) (a) (834 SE2d 762) (2019). So he has not shown the prejudice required for ineffective assistance of counsel.

(c) *Failure to introduce evidence of Aitken's loan to J. P.'s father.*

Aitken argues that his trial counsel was ineffective for failing to put into evidence emails and text messages between Aitken and J. P.'s father about a loan that Aitken made to the father. The defense sought to argue that the existence of the loan had strained the relationship between Aitken and J. P.'s father and was evidence of, in trial counsel's words, "bad blood" between Aitken and J. P.'s family.

Before Aitken testified at trial, the state moved to exclude the emails and text messages, the trial court opined that they would "probably be hearsay," and Aitken's trial counsel stated that he did not plan on presenting the text messages as an exhibit because he thought Aitken's testimony regarding the loan would suffice. Aitken in fact testified that J. P.'s father had borrowed money from him and that the two had a strained relationship. Aitken admitted on cross-examination that he did not have a

written contract with J. P.'s father governing the loan, but he mentioned that there were emails and text messages about the loan.

In closing argument, the prosecutor suggested that Aitken had not testified truthfully about the loan, stating: "And then there was that testimony about an old debt, paperwork, about lost or wasn't signed and no actual amount of money, something mentioned. It was just something that he came up with." The prosecutor made this statement in the context of a larger argument that the defense had attacked J. P.'s character and attempted to "humiliate" him.

Aitken argues that his trial counsel performed deficiently by failing to seek to admit the emails and text messages into evidence. At the hearing on the motion for new trial, trial counsel stated that he had "no idea" why he did not do so. He also testified that he did not anticipate that the state would question the loan's existence in closing argument, given that the state had in its possession the emails and text messages discussing the loan.

But as with the claim of error regarding the Facebook post, we need not decide whether trial counsel performed deficiently in this respect, because Aitken has not shown prejudice. The existence of the loan and the nature of the relationship between J. P.'s father and Aitken had minimal probative value. J. P.'s father was not a trial

19

witness, so his bias was not an issue. And the defense offered no meaningful argument that any difficulties between J. P.'s father and Aitken regarding the loan affected J. P.'s testimony. Aitken argues that the evidence of the loan would have rebutted the state's suggestion in closing argument that Aitken had lied about the loan. Even so, there was strong evidence of Aitken's guilt, as described above, including witness testimony corroborating aspects of J. P.'s story and the evidence of Aitken's flight to avoid arrest on the charges involving R. B. "[G]iven the strong evidence of his guilt, [Aitken] has not demonstrated that his trial counsel's failure to [present the evidence regarding the loan] affected the jury's verdict." *Mohamed*, 307 Ga. at 94 (3) (a). So he has not shown the prejudice required for ineffective assistance of counsel.

(d) *Cumulative prejudice.*

Aitken argues that he was prejudiced by the cumulative effect of trial counsel's deficient performance. See *Bates v. State*, 313 Ga. 57, 69 (3) (867 SE2d 140) (2022). For purposes of this analysis, we have assumed two deficiencies — trial counsel's failure to present evidence authenticating R. B.'s Facebook post and his failure to present evidence regarding the loan to J. P.'s father. "[T]he cumulative prejudice from [these] assumed deficiencies . . . is insufficient to show a reasonable probability that

20

the results of the proceeding would have been different in the absence of the alleged deficiencies." Id.

3. *Response to allegedly improper closing argument.*

Aitken argues that the trial court erred in his response to an objection Aitken made during the state's closing argument. The prosecutor stated that Aitken sold his skateboarding company "almost immediately after meeting with the police. And the next thing he did was wipe those computers. Nothing of evidentiary value was found[.]" Aitken's trial counsel objected, arguing that there was no evidence that Aitken had "wiped" the computers. In response, the trial court instructed the jury that "what the attorneys say during closing argument is not evidence."

Aitken argues on appeal that OCGA § 17-8-75 required the trial court to take additional action in response to his objection. That Code section provides:

> Where counsel in the hearing of the jury makes statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

OCGA § 17-8-75.

21

But OCGA § 17-8-75 "does not prevent counsel from commenting on and drawing deductions from the evidence." *Elliott v. State*, 275 Ga. App. 359, 362 (2) (620 SE2d 584) (2005). The freedom to draw such deductions is part of a prosecutor's "wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion." *Gaston v. State*, 307 Ga. 634, 640 (2) (b) (837 SE2d 808) (2020) (citation and punctuation omitted). The jury in this case had been presented with evidence that a forensic search of Aitken's computers and electronic devices found nothing of evidentiary value. The prosecutor cited that evidence in support of her argument that Aitken had "wiped" his computers. "The remarks made by the prosecuting attorney were logically inferable from the evidence presented," *George v. State*, 260 Ga. 809, 810 (4) (400 SE2d 911) (1991), so they did not violate OCGA § 17-8-75 and the trial court did not err in his response to Aitken's objection. See *Messick v. State*, 276 Ga. 528, 529 (2) (580 SE2d 213) (2003); *George*, supra.

4. *Cumulative effect of error.*

In a separate claim of error, Aitken contends that "the combined prejudicial effect of the trial court's errors and trial counsel's deficiencies affected the outcome of the trial." *Holland v. State*, 314 Ga. 181, 193 (4) (875 SE2d 800) (2022). See *Lane v. State*, 308 Ga. 10, 21-23 (4) (838 SE2d 808) (2020). But as discussed above, we

22

have determined that the trial court did not err in responding to the state's closing argument, see Division 3, and that any deficient performance by trial counsel, even considered cumulatively, did not prejudice Aitken. See Division 2 (d), supra. So Aitken has not shown he is entitled to a new trial on this ground.

*Judgment affirmed. Gobeil and Land, JJ., concur*.